Memorandum of Decision
On September 16, 1997, the Department of Children and Families (DCF) filed a petition to terminate the parental rights of Sean and Lori P. to their son, Shane P. On December 28, 1998, the mother, Lori P., filed a motion to transfer guardianship to the maternal grandparents. A consolidated trial of the termination petition and the motion to transfer guardianship took place on January 12, 14, 15, and 16, 1999. For the reasons stated below, the Court grants the petition to terminate parental rights and denies the motion to transfer guardianship.
FACTS
The Court finds the following facts and credits the following evidence.
A. Background of the Case
Sean, now 34, and Lori, now 37, were married in 1986 and remain legally married. Sean had dropped out of high school and developed a drug and alcohol habit. Lori had graduated high school and completed three years of college. In 1988, they had their first child, Ben.
In 1989, Sean introduced Lori to heroin and Lori quickly became addicted. In 1991, after a series of arrests, Lori and Sean put Ben in the care of the maternal grandparents, where he CT Page 1211 remains to this day. Lori and Sean had another boy, Joel, in 1992. In 1994, the parents placed Joel with the maternal grandparents because of the parents' persistent marital, drug, and criminal justice problems. After a brief stay in a foster home, as discussed below, Joel is back with his maternal grandparents.
Lori gave birth to Shane P. on July 31, 1995. Shane was born premature with a positive toxicity for opiates and went through withdrawal as an infant. The presence of drugs in Shane may have been due to the mother's methadone treatment, although the mother did use cocaine early in her pregnancy. At the time of Shane's release from the hospital, Lori was living with her parents and apparently separated from Sean.
On October 3, 1995, Sean was arrested when, with Lori, Joel, and Shane in the car, he drove down a dirt road, smoked some rock cocaine, and then assaulted the police officers who had arrived at the scene. Sean was later convicted of risk of injury to minors, possession of narcotics, and assault on a police officer. Apparently because of his lengthy criminal record, which included some eight prior felony convictions, a violation of probation, and numerous misdemeanors, and the gravity of the October 3 incident, Sean received a net effective sentence of ten years suspended after five years in prison and five years of probation. He remains in prison with a maximum release date of October, 2000. The mother was convicted of risk of injury and received a suspended sentence.
Based on this incident, DCF obtained an order of temporary custody for Joel and Shane. DCF placed the boys in the foster home of Linda D. and her husband.[2] In that home, Joel threw toys at Shane and did not get along with the other boys there. At some point when Shane was still an infant, DCF returned Joel to his maternal grandparents.
Shane has remained with Linda D. to this day. On June 10, 1996, the court granted the neglect petition and committed Shane to DCF custody for one year. The court has extended the commitment to June 10, 2000.
B. Shane and his Foster Parents
From his birth, Shane has had special needs. At several months, Shane exhibited severe back arching, body tremors, CT Page 1212 screaming, and difficulty keeping down his formula. At twenty-two months, Shane's diagnosis was developmental weaknesses and inconsistencies in the areas of language, neuro-motor functions, behavioral control, and possible learning disability. Shane was monitored by Birth to Three and then, through the hard work of his foster mother, placed in a newly-created town special education program. Shane has now caught up in many areas, although he still is easily frustrated, throws tantrums, has oral motor problems, and drools while eating. Because of concerns about choking, the foster mother has to watch Shane closely while eating and cannot let him eat in the car.
Linda D. has had a total of ten to twelve foster children over the last six years. She currently has one another foster son besides Shane, an adopted son, and a biological son. Shane refers to these boys as his brothers. He refers to his biological brothers Ben and Joel as his friends rather than his brothers. Shane refers to Linda D. and her husband as "mommy" and "daddy." He is very attached to them. Shane does not look forward to visits with his biological parents and needs to speak to the foster father upon arriving home from a visit with his natural father.
Linda D. devotes considerable energy full-time to Shane and knows his needs well. Although Lori P. has made complaints about Shane's care, and DCF investigated Linda's house as a result, the investigation did not substantiate the complaints. A pediatrician and psychologist who testified in this case complimented Linda D. as a committed and understanding mother. The court shares in this view. The foster parents have become Shane's psychological parents, they love Shane, and would like to adopt him.
C. The Father
After his arrest in October, 1995, the father did not request that DCF facilitate a visit with Shane until February, 1996. He then made requests to DCF for visits with Shane in April and June, 1996 and made occasional requests of his parents to help in setting up visitation. In approximately February, 1997, the father initially requested visits but then said that he did not know Shane and was not sure whether to begin visits.
In March, 1997, the paternal grandparents requested on Sean's behalf that DCF provide a visit with Shane. In August, 1997, the father had his first prison visit with Shane. The slow response CT Page 1213 to the grandparents' request was due to the mixed signals that the father had given out as well as the frequent turnover in DCF social workers assigned to this case. Another visit took place in October, 1997, but Shane was uncomfortable and the father suggested that the visit end early. The father did not request more visits until March, 1998. Since that time, there have been about eight more visits. Sparse conditions in the prison visiting rooms have limited the amount of interaction between father and child. The father has been appropriate, but Shane has been reluctant, at least at the outset of the visit. The father has not sent Shane any birthday or Christmas cards or presents. The father admitted, both in and out of court, that Shane does not know him as a father. Shane, indeed, does not refer to Sean as his "daddy" or use any similar term.
The father has done well in a prison electronics education program, reaching the level of an associates degree. He now attends AA and NA meetings, but did not start until 1998, essentially because he felt his time was better spent in the electronics course. According to a court-ordered psychological evaluation, which the Court credits, the father has a history of sociopathic behavior, has long term emotional problems, such as possible learning disability, has a substance abuse addiction that calls for intensive treatment upon release, possesses poor parenting skills, and in sum lacks the emotional and intellectual resources to become a good parent for Shane, especially given Shane's special needs. The father testified, however, that he does not need parenting classes or counseling, and does not believe he needs an inpatient drug treatment program upon release from prison.
D. The Mother
When DCF initially took custody of Joel and Shane, the mother lost her AFDC benefits, which she had been using for methadone maintenance. The mother became ill and relapsed into heroin use. After visiting Shane a few times in late 1995, the mother's whereabouts became unknown to DCF and, beginning in January, 1996, she failed to make scheduled visits. Over the next several months, the mother committed numerous crimes such as possession of narcotics, forgery, larceny, and failure to appear in court. On July 28, 1996, the mother was arrested for a robbery committed by a new boyfriend while Lori and Ben waited in a car. In driving away from the scene, Lori ran over a citizen's foot. For this incident, the mother was convicted of robbery, risk of injury to CT Page 1214 a minor, and second degree assault, and received a net effective sentence of seven years in prison. Her maximum release date is June 2, 2004.
Upon arriving in jail in August, 1996, the mother requested through a DCF-prison liaison and her own mother that she receive visits with Shane. The mother received her first visit in January, 1997, and has seen Shane on a generally monthly basis since then. At the visits, the mother has been fully appropriate with Shane, and has played with and read to him. Shane has enjoyed the visits, although he does not call Lori "mommy" or any similar term. The mother admitted at trial that Shane does not know her as he should his mother. The mother has nonetheless requested numerous pictures of Shane and recently has sent him hand-made gifts for his birthday and Christmas.
Lori has completed nearly every relevant rehabilitative program available at her prison, including courses covering substance abuse, parenting, and relationship issues. She has received excellent evaluations of her work at prison jobs. Lori, however, has a long history of depression and is unable to receive individual counseling in prison. Upon her release, she will have to go into an intensive treatment program to address both her depression and her drug addiction.
E. The Maternal Grandparents
Shane sees Ben and Joel twice a month at the residence of his maternal grandparents. The grandparents are 73 and 74 and are in good health. Shane refers to them as "Joel's grandparents." The maternal grandparents have regularly sent Shane Christmas presents, although they have not recognized his birthday and do not call the foster mother to find out how Shane is doing. At visits, Shane plays with Ben and Joel, but may still be afraid of Joel as a result of Joel's earlier aggressive behavior. Both Ben and Joel receive counseling for behavioral difficulties. If the maternal grandparents were to receive guardianship of Shane, they would return him to his mother upon her release and rehabilitation.
ADJUDICATION
A. Reunification
In order to terminate parental rights, DCF must initially CT Page 1215 show by clear and convincing evidence that DCF "has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts." Conn. Gen. Stat. § 17a-112(c)(1). The court need not make such a finding, however, "if a court has determined at a hearing pursuant to subsection (b) of section 17a-110 [dealing with permanency planning for committed children] that such efforts are not appropriate." Id. On May 8, 1997, and again on May 14, 1998, at commitment extension hearings, the court made the requisite finding that further efforts to reunify the parents with Shane are not appropriate.
B. Statutory Grounds
To prevail in a nonconsensual termination of parental rights case, DCF must also prove by clear and convincing evidence that one of several statutory grounds for termination exists. See Inre Michael B., 49 Conn. App. 510, 512 (1998); Conn. Gen. Stat. § 17a-1 12(c)(3). General Statutes § 17a-112(c)(3) requires that, with one exception not pertinent here, these grounds must have existed for at least one year unless the Court waives the one year requirement] based on the standards set forth in § 17a-112(d).[3] In this adjudicatory phase, the Court is limited to events preceding the filing of the petition or the latest amendment. See Practice Book § 33-3(a). The relevant date in this case is thus September 16, 1997.
DCF has alleged the grounds of abandonment, failure to rehabilitate, and lack of an ongoing parent-child relationship against both parents. DCF alleges that these grounds have existed for more than one year. The Court finds that DCF has proven abandonment by the father, failure to rehabilitate against both parents, and lack of an ongoing parent-child relationship against the mother by clear and convincing evidence.
1. Abandonment
General Statutes § 17a-112(c)(3)(A) provides that a ground for termination exists when "[t]he child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of the child." "Attempts to achieve contact with a child, telephone calls, the sending of cards and gifts, and financial support are indicia of `interest, CT Page 1216 concern or responsibility' for the welfare of the child." In reMigdalia M., 6 Conn. App. 194, 208-209, cert. denied,199 Conn. 809 (1986). Conversely, "where a parent fails to visit a child, fails to display any love or affection for the child, has no personal interaction with the child, and no concern for the child's welfare, statutory abandonment has occurred." Id. at 209. The statutory term "maintain" implies a "continuing, reasonable degree of concern." Id. at 210.
In this case, the mother abandoned Shane between January and August, 1996, when she relapsed on heroin and had no apparent contact with her son. This period of time, however, falls short of the one year ordinarily necessary to establish a statutory ground of termination. The mother was incarcerated in August, 1996. Although incarceration does not constitute a complete defense to abandonment, it obviously limits the opportunity to maintain contact with one's children. See In re Juvenile Appeal
(Docket No. 10155), 187 Conn. 431, 443 (1982). Given the mother's confinement, she maintained a reasonable degree of concern about Shane. Upon her arrival in prison, the mother requested a visit with Shane. The first visit did not take place until January, 1997, but this delay appears to be bureaucratic in nature and not the mother's fault. Since that time, the mother has pursued regular visits, requested pictures of Shane, expressed a high degree of concern about his well-being, and recently sent him hand-made gifts for his birthday and Christmas. The evidence is thus not clear and convincing that the mother has abandoned Shane.
The father's case is different. The father abandoned Shane between his arrest in October, 1995, and his request for a visit in February, 1996, a five month period. Over the next year, the father made several direct and indirect requests for visits, and DCF failed to respond. In February, 1997, however, the father expressed ambivalence concerning whether he wanted a visit. After a March, 1997 request for a visit by the paternal grandparents on Sean's behalf, the father visited Shane in August and October, 1997. At the October visit, the father again exhibited some ambivalence, and then failed to request another visit until five months later, in March, 1998. At no point has the father recognized Christmas or Shane's birthday, as has the mother, who is also incarcerated. On the whole, the Court finds that the father's level of interest in his son was sporadic, which is not sufficient to defeat statutory abandonment. See In re Rayna M.,13 Conn. App. 23, 36-38 (1987). Because the father did not CT Page 1217 "maintain" a "continuing, reasonable degree of concern" in Shane over a period of more than one year, In re Migdalia M.,6 Conn. App. at 210, DCF has proven abandonment against the father.[4]
2. Failure to Rehabilitate
A second statutory ground for termination arises when "the parent of a child who has been found by the Superior Court to have been neglected or uncared for in a prior proceeding has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child." Conn. Gen. Stat. § 17a-112(c)(3)(B). No dispute exists that the Court has previously found the child to have been "neglected," thus satisfying a statutory prerequisite.
The rest of the statute requires the Court to find whether the facts "encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child." Conn. Gen. Stat. § 17a-112(c)(3)(B). This portion of the statute requires the Court to analyze a parent's rehabilitation "as it relates to the needs of the particular child" and determine whether such rehabilitation is foreseeable "within a reasonable time." In re Luis C., 210 Conn. 157, 167 (1989). The statute, however, does not require parents "to be able to assume full responsibility for a child, without the use of available support programs." In re Jessica M., 49 Conn. App. 229, 240 (1998) (internal citation omitted). Because of the requirement that the Court predict what will happen within a "reasonable time" after the filing of the termination petition, it is sensible to conclude that the Court can consider not only the parents' conduct before the filing of the termination petition, but also the conduct occurring after it.
A "reasonable time" after the September, 1997 filing of the termination petition has elapsed. Neither parent, due to their incarceration alone, can "assume a responsible position in the life of the[ir] child." Conn. Gen. Stat. § 17a-112(c)(3)(B). Based on their maximum release dates, the parents' inability to assume such a position will probably continue for another year in the father's case and several years in the mother's case.
But there is much more than the fact of incarceration here. CT Page 1218 Both parents have lengthy criminal records highlighted, in this context, by one risk of injury conviction by the father and, alarmingly, two risk of injury convictions by the mother. While both parents, and particularly the mother, have made significant strides in rehabilitating themselves, upon release from prison they will have to address their substance addictions. There is always a risk of relapse in the outside world because, as the father testified, the real test with an addiction is "when the rubber hits the road." The mother will also have to address her mental health problems. The father does not even recognize that he currently lacks the parenting skills to raise a boy with Shane's special needs. Even with counseling and parenting classes, he may simply lack the resources necessary to fulfill the task. For all these reasons, the Court finds that, for over one year, the mother and father have failed to rehabilitate themselves to the point that "within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child." Conn. Gen. Stat. § 17a-112(c)(3)(B).
3. No Ongoing Relationship
DCF also alleges that there is no ongoing parent-child relationship between Shane and the parents. To prove this ground, DCF must show the absence of "the relationship that develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and [that] to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child." General Statutes § 17a-112(c)(3)(D). This ground encompasses a situation in which "regardless of fault, a child either has never known his or her parents, so that no relationship has ever developed between them, or has definitely lost that relationship, so that despite its former existence it has now been completely displaced." In re JuvenileAppeal (Anonymous), 181 Conn. 638, 645 (1980) (internal citation omitted). The decisive question is "whether the child has no present memories or feelings for the natural parent." Id. at 646.
Both parents admit that Shane does not see them as parents and the evidence firmly establishes that Shane views his foster mother and father as his parents. The analysis for each of the natural parents is different, however. The mother was out of prison for approximately Shane's first year of life. She thus had time to develop a parent-child relationship with Shane. Instead, CT Page 1219 Shane went into foster care in October, 1995, the mother relapsed into heroin use, and the mother visited Shane infrequently through the end of the year. In January, 1996, the mother plunged into drug addiction and had no relationship at all with Shane for the next eight months. Although starting in August, 1996 the mother immediately and regularly requested visits with Shane from prison, the evidence indicates that for several years Shane's positive feelings for his mother have focused on Linda D., rather than Lori P. The court finds that DCF has proven lack of an ongoing parent-child relationship for more than one year against the mother.
The father went to prison when Shane was two months old. The court credits the testimony of Dr. Robin Grant-Hall, a psychologist called by DCF, that, even if the father had requested and received regular monthly visits in prison, he could not have maintained any parent-child bond that had developed during Shane's first two months. A monthly visit to the cold walls of a prison visiting room is not sufficient for a boy to develop an attachment to his father.
It is true, of course, that it is entirely the father's fault that he was in prison. The statutory ground in question, however, encompasses a situation in which a child has no parent-child relationship "regardless of fault." In re Juvenile Appeal(Anonymous), 181 Conn. at 645. Thus, the issue becomes whether, regardless of the father's fault in being imprisoned from the time that Shane was two months old, the ground of lack of an ongoing relationship is available in this case. The situation here is similar to that in In re Valerie D., 223 Conn. 492, 532
(1992), in which the Supreme Court held that the lack of relationship ground did not apply in a case in which DCF obtained custody and filed for termination virtually upon the birth of a child because of the "practical impossibility of maintaining the kind of contact with the child required to establish an ongoing parent-child relationship. " Id. at 534. Here the same "practical impossibility" existed for an imprisoned father with an infant son. This Court concludes that, even though Shane has no positive feelings for Sean as a father, Sean cannot be charged with lack of an ongoing parent-child relationship under the circumstances present here.[5]
DISPOSITION OF THE TERMINATION PETITION
In the dispositional phase of a termination case, the Court CT Page 1220 must consider whether DCF has proven by clear and convincing evidence that "termination is in the best interest of the child." Conn. Gen. Stat. § 17a-112(c)(2). The Court can consider all events occurring through the close of the dispositional hearing. Practice Book § 33-5.
The best interest of Shane P. clearly and convincingly favors termination of the parental rights of his parents, Lori and Sean P. Shane is bonded to his foster parents. His foster mother is a hard-working, full-time mother who pays careful attention to his special needs. There are several other boys in the foster home. The foster parents have had Shane for over three years, know him well, and would like to adopt him. Although Shane does warm up to his natural parents when he visits them in prison, he is not eager to see them initially and seeks the comfort of his foster parents after visits. Indeed, Shane does not view Lori and Sean as his "mommy" and "daddy." The father will likely remain in prison for at least another year; the mother, for several years. Upon release, the parents will need time to address their substantial rehabilitative needs. There is no reasonable certainty that, once released into society, they will be able to overcome their drug addictions and emotional problems.
In arriving at a decision, the Court must consider and make written findings regarding seven factors set out in General Statutes § 17a-112(e). See In re Tabitha P.,39 Conn. App. 353, 362 (1995). A discussion of these factors follows.
1) The timeliness, nature and extent of services offered, provided and made available to the parent and child by an agency to facilitate the reunion of the child with the parent.
Based on the foregoing discussion, the Court finds that DCF provided foster care for Shane and offered the parents visitation. These services were relevant to the needs of the parties. DCF did not always provide visitation in a timely manner.
2) Whether DCF has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980.
Based on the foregoing discussion, the Court finds that DCF provided visitation, but that there was no reasonable possibility of reunification given the parents' lengthy prison sentences. CT Page 1221
3) The terms of any applicable court order entered into and agreed to by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order.
On June 10, 1996, the Court approved the following expectations for Lori and Sean P.: (1) keep all appointments set by or with DCF and keep whereabouts known to DCF and your attorney, (2) visit the children as often as DCF permits, (3) participate in counseling for parenting, individual needs, and substance abuse, and follow their recommendations, (4) provide random urine screens, (5) sign releases as requested, (6) secure and maintain adequate housing and income, (7) no substance abuse, and (8) no further involvement with the criminal justice system.[6] Because the parents were in prison, DCF's only obligation under these expectations was to facilitate visitation, which it did with occasional inefficiency. Based on the foregoing discussion, the Court finds that the mother complied with these expectations to the extent possible in prison. The father failed to request visits as often as DCF permitted and did not begin drug and alcohol counseling until 1998.
4) The feelings and emotional ties of the child with respect to his parents, any guardian of his person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties.
As stated above, Shane is bonded to his foster parents. Shane does not view Lori and Sean P. as his parents.
5) The age of the child.
Shane is presently three and one-half years old.
6) The efforts the parent has made to adjust his circumstances or conditions to make it in the best interests of the child to return him to his home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child. CT Page 1222
Based on the foregoing discussion, the Court finds that Lori P. has made all reasonable efforts to rehabilitate herself in prison and has sought regular visitation with Shane but, because of the gravity of her crimes and her past criminal record, will remain incarcerated for a substantial period of time. Sean P. did not begin drug rehabilitation until several years into his most recent prison sentence and has not been consistent in seeking to maintain contact with Shane. Because of his prison sentence and need to rehabilitate himself further, and because of Shane's attachment to his foster family, the father is not in a position to have Shane returned to him.
7) The extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person, or by economic circumstances of the parent. The parents here did not face unreasonable interference from each other, from any third persons, or from economic circumstances. The parents' predicament is a consequence of their own actions.
THE MOTION FOR TRANSFER OF GUARDIANSHIP
Shane is plainly more attached to his foster parents than to his maternal grandparents, whom he sees for visits twice a month. In the foster home, Shane regards the other boys as his brothers. Although placement with the maternal grandparents would reunite Shane with his biological brothers, Shane was separated from them in his infancy and is not as close to them, and particularly Joel, as he otherwise might be. If the foster parents are successful in adopting Shane, hopefully they will continue to let Shane visit his biological family, and the Court encourages the foster family to allow such contact. The maternal grandparents, although in good health, are not young and already have two boys with special needs. The best interest of Shane mandates that he continue in his present foster home where his needs are known and amply met. For these reasons, the mother's motion to transfer guardianship to the maternal grandparents is denied.
CONCLUSION
Based upon the foregoing findings, the Court determines that it is in the best interest of Shane P. for a termination of parental rights to enter with respect to the mother, Lori P. and CT Page 1223 the father, Sean P., and that the motion for transfer of guardianship be denied. Accordingly, the Court hereby grants the petition to terminate the parental rights of Lori P. and Sean P. and denies the motion for transfer of guardianship. The Court further orders that the Commissioner of DCF is appointed statutory parent for Shane for the purpose of securing an adoptive family. If the foster parents are willing to adopt, it is the Court's direction that they receive first consideration. The Commissioner shall file with this Court no later than ninety days following the date of judgment a written report of efforts to effect such permanent placement and file further reports as are required by state and federal law.
It is so ordered.
Carl J. Schuman Judge, Superior Court
[2] The evidence does not reveal the husband's first name.
[3] Effective July 1, 1998, section 8 of Public Act No. 98-241
eliminates the one year requirement.
[4] The Court can waive the requirement that a statutory ground exist for more than one year if it finds "[f]rom the totality of the circumstances surrounding the child that such a waiver is necessary to promote the best interest of the child." Conn. Gen. Stat. § 17a-112(d)(1). To the extent that the father's abandonment was less than one year, the Court waives the one year requirement. As discussed elsewhere, Shane is completely bonded to his foster parents and the best interests of the child favor termination. See also note 3 supra.
[5] Unlike the case of the father, the mother was not in prison during Shane's first year of life. In terms of Valerie D., the mother can be charged with lack of an ongoing parent-child relationship because, regardless of her "fault" in lapsing into heroin addiction, it was not "practically impossible" for her to maintain her relationship with Shane. The mother could have sought help for her addiction, but did not.
[6] The expectations form for the mother introduced at trial was not signed by her or her attorney.
CT Page 1224